Cite as 2023 Ark. App. 594

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-22-616

| | | |
|---|---|---|
| | **Opinion Delivered** December 13, 2023 | |
| JIMMIE HOLLAND | | |
| APPELLANT | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CR-16-2498] | |
| V. | | |
| | HONORABLE JOANNA TAYLOR, JUDGE | |
| STATE OF ARKANSAS | | |
| APPELLEE | AFFIRMED | |

## KENNETH S. HIXSON, Judge

Appellant Jimmie Holland appeals from an order denying his amended petition for postconviction relief filed pursuant to Arkansas Rule of Criminal Procedure 37.1. Holland argues on appeal that the circuit court erred in denying his petition for postconviction relief because his trial counsel was ineffective for (1) selecting an unreasonable defense strategy and unjustifiably believing the alleged rape victim would not claim penetration at trial; (2) failing to move to exclude voicemails sent from appellant to the alleged victim before the alleged offense in which Holland had made profane and crude remarks; and (3) failing to prepare or call an available witness (appellant's mother) during sentencing. We affirm.

I. *Background*

Before addressing the allegations of ineffective assistance of counsel, it is necessary to discuss some of the events leading to Holland's jury trial and the evidence adduced at trial.

Holland was charged with rape committed against AG pursuant to Ark. Code Ann. § 5-14-103(a)(1) (Repl. 2013), which provides that "[a] person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person [b]y forcible compulsion." In the felony information charging Holland with rape, the State specifically alleged that Holland committed rape by engaging in *sexual intercourse* with another person by forcible compulsion. "Sexual intercourse" is defined as "*penetration, however slight*, of the labia majora by a penis." Ark. Code Ann. § 5-14-101(11) (Repl. 2013) (emphasis added). Holland's primary argument in this postconviction proceeding is that his trial counsel was ineffective for failing to recognize or anticipate that AG would claim penetration at trial. Hence, the reports that were generated and were made available to the defense before trial are relevant to our discussion.

On the morning after the alleged rape occurred, AG went to the hospital, where she was subsequently interviewed by Officer Justin Collins. Officer Collins made a report of the interview. According to Officer Collins's report, AG had met Holland on a dating website called Tinder about a week earlier. After about a week of exchanging text messages, AG and Holland agreed that they would meet in person. At first they had planned to meet for drinks somewhere, but AG was having dinner with friends and was running late that night, so they agreed to instead meet at AG's house.

AG told Officer Collins that after Holland arrived at her house, she and Holland watched movies and drank some whiskey. Sometime later, AG lay down to go to sleep and Holland started kissing her, rubbing her breasts, and putting his hand in her underwear.

2

Holland asked AG to put on something more comfortable, and AG changed into a pair of shorts and a t-shirt. Holland continued to touch her and then removed her underwear and began performing oral sex. Holland began to penetrate AG with his finger, but he was being too aggressive, and AG told him it hurt and to stop. AG stated, however, that she was fine with the oral sex. AG began touching Holland with her hand and reciprocated the oral sex. This went on for a while, and then they were lying in bed next to each other.

According to AG's account, Holland asked her if she had a condom. She told him she could get one from her roommate but that she did not have one. AG tried to explain to him that she did not want to have vaginal sex because she was not on birth control. Officer Collins's report states:

> Holland then got on top of her and tried for vaginal sex. She said she was on her back and Holland was on top of her and he was trying to force his penis inside of her. AG said she was telling him "no" and she began to squeeze her thighs together to prevent him from penetrating her. She said she continued to tell him multiple times and then she began crying whenever he continued to force himself on her. She said when she began crying he had gotten mad. He sat up and stopped. She said that during this time she was sitting in bed crying and Holland was extremely angry. She stated he was mad and yelling at her.

AG stated that after Holland yelled at her for a while, she lay facing the wall, and Holland began trying to penetrate her from behind. She stopped him again. They argued a second time, and Holland got very loud and threatened to do property damage at the residence.

Eventually AG and Holland lay down to sleep, during which time Holland was rubbing AG and trying to penetrate her with his finger, but AG tensed up, and he was unable

3

to. Holland left early the next morning, and after he left, AG went with her roommate to the hospital.

AG underwent a sexual-assault examination at the hospital, and the report from the examination was also made available to the defense before trial. Nurse Sue Stockton conducted the examination. During the course of the examination, Ms. Stockton asked AG what had happened. In Ms. Stockton's report, she documented oral sex and digital penetration. However, the report noted, in grid format, an "X" checking the corresponding box labeled "Attempt" for the category "Penetration of vagina by penis." Ms. Stockton's report also gave a narrative of the events, with the following excerpt:

> Then he got on top of her and she stopped him because he didn't have a condom. Then he became angry and said why aren't you on birth control. She felt she had to explain. He got on her again and she said, "no - no," she started crying. He got off and got behind her and attempted anal sex. She told him "no." He began yelling a lot and belittling her.

Before trial, Holland was also provided with the State's crime-lab reports. The serology report noted that vaginal swabs of AG were negative for semen but positive for P30. The DNA report noted that Holland's DNA was not found on the vaginal swabs but that his DNA was detected on the shorts AG had been wearing that night.

At a pretrial hearing, the prosecutor and defense counsel discussed the possible content of the State's witnesses' testimony. The prosecutor stated that the State was maintaining an open-file policy. The prosecutor also stated, "I just assumed Holland's attorneys are calling the witnesses to see what they are going to testify to because a lot of this is not actually in the reports, but a lot of it is based on my conversations with them."

4

Holland's counsel acknowledged that he had not attempted to call the victim but stated that the State's witnesses do not have to talk to him. Holland's counsel suggested that all statements of the State's witnesses would need to be disclosed in discovery to be presented at trial to avoid a "trial by ambush."

As the trial date grew near, Holland filed a motion in limine to limit discovery and exclude nondisclosed evidence. Shortly thereafter, the parties discussed via email whether there would need to be a hearing on the motion. In this email exchange, the prosecutor stated that "there's been nothing new in this case for a very long time." Holland's counsel responded, "All I'm trying to do is make sure no witnesses, reports, etc. are added." Holland's counsel advised that a hearing would be unnecessary unless the State had an objection, and the prosecutor responded, "I don't need one." No hearing was held, nor did the circuit court rule on the motion in limine.

Subsequently, less than two weeks before trial, there was a final email exchange between the parties pertaining to discovery. In this email exchange, Holland's counsel took the position that the victim, AG could not testify to anything that was outside of discovery, and he asked the prosecutor if AG was "going to possibly say anything that is not contained in discovery." Holland's counsel asked the prosecutor to "verify that [he doesn't] intend to offer any evidence other than what we have, i.e., Collins's report." The prosecutor replied:

> I can't say exactly what she will say and, as a former prosecutor, you know that I cannot be expected to provide everything a witness is going to say in discovery. My expectation is that her testimony will fall within the general structure of what the officer's reports indicate. However, we are dealing with the testimony of a witness based on her experience of events.

Holland's counsel responded:

> This isn't a collateral witness. She is the one making a rape allegation which is the charge. I believe I am entitled to notice of any potential allegation and I would expect to know what she is going to say in its entirety as it pertains to the allegations. There is nothing ancillary about her testimony and we haven't been provided much which is why I am concerned.

The prosecutor then stated, "I believe you have the general contents of her testimony in the reports," and "I don't believe there will be anything major added in the way of allegations." The email exchange concluded with Holland's counsel stating "fair enough" and that he was "not trying to be difficult" but needed to "make sure [he] covered all bases on a case of this magnitude."

At trial, the State put on the following physical evidence. Sue Stockton, the nurse who examined AG, testified that there was a considerable number of abrasions to AG's genital area. Shelby Pugh, a serologist, testified that AG was given a rape kit, and Ms. Pugh tested the vaginal swabs. Ms. Pugh indicated that no semen was detected on the vaginal swabs but that they were positive for P30. Ms. Pugh testified that P30 is a component of seminal fluid but can also be found in other body fluids. Gisele Hardy, a DNA analyst, testified that no male DNA was found in the vaginal swabs or in AG's underwear but that Holland's DNA was found inside the shorts that AG had been wearing that night.

Three weeks after the alleged rape occurred, Holland agreed to a custodial interview with Officer Brian Hanna, and the audio from this interview was played for the jury. In that interview, Officer Hanna asked Holland if he and AG had had sex, and Holland denied

6

having had sex and said he did not even remember kissing her. Holland eventually admitted having been in AG's bed and stated that he may have kissed her and rubbed her butt. Officer Hanna asked the following question: "She says that you guys had sex and she's saying that some of it was consensual. Oral sex, you know, was consensual between you guys. But the *actual penetration part* wasn't." (Emphasis added.) Holland replied that he did not recall oral sex and stated, "I remember other stuff. I know for a fact I didn't have sex with her. There was *no penetration* in there." (Emphasis added.)

AG testified about the events that occurred on the night of the alleged rape. AG explained how she had met Holland on the Tinder dating website and then arranged to meet with him in person a week later. AG testified that Holland came to her house and that they went to her room and watched movies and drank some whiskey. AG got tired of watching movies, and she lay down to go to sleep. At that point, Holland began kissing AG, and she kissed him back. Holland asked AG to change into something more comfortable, and she put on a pair of shorts and a t-shirt. The kissing continued, and Holland took off AG's shorts and began performing oral sex on her. AG testified that, although she did not really enjoy this, she did not stop him. Holland started using his fingers, and it started to hurt, so AG pushed his hand away and told him to back off. After that, AG performed oral sex on Holland.

AG testified that, at some point, the idea of "having sex" came up. Holland asked AG if she had a condom. Although AG did have a condom, she told Holland she did not have one because she did not want to have sex with him. AG testified that she also told

Holland that she was not on birth control and that "for that reason, I didn't want to have sex, too." AG testified that Holland clearly knew that she did not want to have sex. AG testified, "The next thing I remember . . . happening was he was on top of me and he was trying to have sex with me. I just started crying. He continued to push, but eventually stopped because I was crying."

The prosecutor asked AG to explain what she meant by "he was trying to have sex." AG replied, "He was pushing into me and he was able to get the head of his penis—." At that point Holland's counsel objected, stating that "[t]his has been my concern for the entire time this case has gone on. There is nothing anywhere in discovery that says what she's about to say." Holland's counsel argued that if this testimony was allowed, it would be a *Brady* discovery violation as well as a due-process violation because Holland was not given notice. The prosecutor stated, "I believe in all of our meetings that I have made it clear that I believe I can prove penetration." Holland's counsel replied, "I've got nothing in my file that says that." The prosecutor stated, "I'm not required to do your investigation. You have talked to my witnesses probably more than I have. Yet, this is the one witness you don't seem to have talked to."

The trial court advised that it did not believe there had been a discovery violation and that it would allow AG to continue her testimony. The trial court stated further that Holland's counsel could use AG's prior statements to impeach her.

The prosecutor's direct examination of AG continued. The prosecutor asked whether Holland's penis "enter[ed] inside your vagina," and AG said that it did. AG testified

8

that she was trying to squeeze her legs together so he could not go any further. AG stated that "he wasn't deep inside me" but that she had no doubt he had entered her. AG testified that after this occurred Holland got angry with her; he eventually lay down by her and tried to fondle her some more; and he left the following morning. After Holland left, AG went to the hospital. AG indicated that, during her interviews after the incident, nobody explained to her the legal definition of rape, and nobody specifically asked her what she meant by "trying to have sex."

On cross-examination, Holland's counsel vigorously attempted to impeach AG with the reports from her pretrial interviews. On cross-examination, AG again testified that Holland penetrated her vagina with his penis, but she acknowledged that in her interview with Officer Collins, "I don't think I ever used those words." Reading from Officer Collins's report, Holland's counsel asked AG about her statements that "he was trying to force his penis inside me," and she "squeezed her thighs together to prevent him from penetrating her." When asked if she disagreed with the latter of these statements, AG responded, "Penetrating me fully? Where he was completely inside of me?" AG then stated, "I don't know if I explained it in depth but I was stressed out." AG stated that Holland was continuing as she was saying no and crying and that he eventually stopped. Holland's counsel also confronted AG with Nurse Stockton's report wherein an *attempted* rape was noted along with the statement that "he got on top of her and she stopped him because he didn't have a condom." AG indicated that nobody had told her the definition of rape or that "even just a little penetration" would fit the definition.

George Schiro, a serology and DNA expert, testified for the defense. Mr. Schiro testified that he had reviewed the State's crime-lab reports. Mr. Schiro concluded that no semen or male DNA was found in AG's vaginal swabs. Mr. Schiro also testified that he that thought the crime-lab report documenting the presence of P30 on the vaginal swabs was a "false positive." Mr. Schiro's written forensic report containing these findings was offered by the defense and admitted into evidence.

Based on the evidence presented, the jury convicted Holland of rape and sentenced him to thirty-three years in prison.

After Holland's conviction, he appealed to this court, and his primary argument on appeal was that AG's "surprise testimony" of penetration was erroneously admitted for various reasons, including that it was a discovery violation and violated due process. We affirmed on direct appeal. *Holland v. State*, 2020 Ark. App. 434 (*Holland I*). Holland asserted in the direct appeal that in neither of the reports provided to him did AG allege penetration, and he contended that the State never provided him with an allegation that penile penetration of AG's vagina had occurred. *Id.* We rejected that argument and held that, in addition to the State's criminal information expressly apprising Holland of the charge against him, Holland was made aware of the allegation of penetration because he was informed of the allegation in his custodial interview; he was given the crime-lab reports showing that AG was given a rape kit, and her vaginal swabs were tested for semen; and we noted that if AG was not alleging penetration, there would have been no need to perform the rape kit or conduct these tests. *Id.* In the direct appeal, Holland also challenged the sufficiency of the

10

evidence, arguing there was insufficient evidence of forcible compulsion, and we rejected that argument as well. *Id.*

## II. *Holland's Amended Petition for Postconviction Relief*

Following our affirmance on direct appeal, Holland timely filed a petition for postconviction relief. Holland subsequently sought leave to amend his petition, which the circuit court granted, and Holland filed an amended petition for postconviction relief in which he argued that his trial counsel was ineffective on six grounds. However, because Holland argues only three of these ineffective-assistance grounds on appeal, we limit our discussion to those three points. Under ground one, Holland argued that his counsel was ineffective for implementing an unreasonable defense strategy, stating that counsel knew or should have known AG would allege penetration and that the defense was organized around the false premise that she would not. Under ground three, Holland argued that his counsel was ineffective in failing to move to exclude voicemails that had been sent from Holland to AG before the alleged offense in which Holland had made profane and crude remarks. Under ground six, Holland argued that counsel was ineffective for failing to prepare or call an available witness—Holland's mother—during sentencing. In his amended petition, Holland also requested a hearing on his claims, and his request for a hearing was granted by the circuit court.

At the postconviction-relief hearing, Holland's trial counsel, Mark Hampton and Shane Wilkinson, both testified. Hampton testified that he had practiced criminal law exclusively for thirty-six years and that he chose Wilkinson, a lawyer of twenty years, to be

11

his co-counsel because of Wilkinson's former experience prosecuting sexual-assault cases and

his general reputation as an excellent attorney. Both Hampton and Wilkinson testified with

respect to their trial strategy and their decision not to move to suppress the voicemails.

Holland's mother also testified at the hearing, and she testified as to what she would have

said to the jury had she been called as a defense witness during sentencing. Additional

testimony of these witnesses will be discussed as necessary, *infra*, in our analysis of each

specific point raised on appeal.

After the hearing, the circuit court entered an order denying and dismissing Holland's

amended petition for postconviction relief. In its order, the circuit court made these relevant

findings:

> The Defendant/Petitioner presented no evidence or facts to support his allegation in GROUND 1 that "trial counsel's theme of defense was unreasonable as recognized by this court and the Arkansas Court of Appeals." First, this Court has made no findings or statements as to the "reasonableness" of the defense's strategy related to penetration. Second, this Court scoured the Opinion handed down by the Court of Appeals and found no such finding related to the reasonableness of the strategy. While the trial counsel team testified in this evidentiary hearing that they were shocked by the victim's testimony of penetration, they were nonetheless prepared for and conducted a spirited cross examination of the victim, including attacking her credibility regarding the penetration allegation. Additionally, they vigorously cross examined all of the state's witnesses regarding any and all physical evidence, documentary evidence, and prior statements. The Defendant/Petitioner has not presented any evidence in this proceeding that was not presented in the trial regarding the victim's or any other witness's credibility, nor has he presented one shred of evidence in support of his argument that he was prejudiced by the defense strategy related to penetration. It is not enough for Defendant/Petitioner to merely argue a different trial strategy should have been employed, he must show by evidence what that strategy would have been. No evidence has been presented that counsel's performance was deficient and that this trial strategy was an error so serious that counsel was not functioning as the counsel guaranteed by the Constitution, nor has Defendant/Petitioner demonstrated that there is a reasonable probability that but for

12

the "no penetration" trial strategy, the jury would have had a reasonable doubt respecting guilt.

. . . .

The Defendant/Petitioner presented no evidence or facts to support his allegation in GROUND 3 that trial counsels' failure to move to exclude the voicemails and their subsequent admission at trial was "extremely prejudicial and in such a close case were likely the deciding factor in the jury's decision to find Holland guilty." This entire argument is based on nothing but speculation. No evidence was presented at the hearing to show the jury was swayed by the content of the voicemails or that they relied on them either in the guilt phase or in sentencing. Once again, it is not enough for Defendant/Petitioner to merely state he would have been acquitted but for the admission of the voicemails, he must show by evidence that there is a reasonable probability that the outcome of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial, and Defendant/Petitioner has not met this burden. Defendant/Petitioner has failed to show the failure to object was an error so serious that counsel was not functioning as the counsel guaranteed by the Constitution, nor has Defendant/Petitioner demonstrated that there is a reasonable probability that but for the failure to obtain a ruling, the jury would have had a reasonable doubt respecting guilt.

. . . .

Defendant/Petitioner alleges as the GROUND 6 that trial counsel failed to investigate, prepare, and/or call sentencing witnesses, specifically, Defendant/Petitioner's mother. In short, the evidence presented at the evidentiary hearing was that Defendant/Petitioner's mother, Mrs. Holland, "was in absolute shock and not capable of testifying" during the sentencing phase of the trial. Because she was not capable of testifying, trial counsel did the best it could to argue for a lenient sentence. The lack of sentencing witnesses was not for lack of preparation or investigation, it was due to lack of a competent witness.

Defendant/Petitioner has failed to show the failure to call sentencing witnesses was an error so serious that counsel was not functioning as the counsel guaranteed by the Constitution, nor has Defendant/Petitioner demonstrated that

13

there is a reasonable probability that but for the failure to call sentencing witnesses, the jury would have had a reasonable doubt respecting guilt.

. . . .

The Court makes the following conclusion of law as to each argument:

1.      The Defendant/Petitioner failed to present any credible facts whatsoever to support his allegations.

2.      The Defendant/Petitioner has failed to show that trial counsel's performance was deficient in that his trial lawyers made errors so serious that they were not functioning as the counsel guaranteed by the 6th Amendment of the U.S. Constitution.

3.      The Defendant/Petitioner failed to demonstrate that he suffered prejudice as a result of trial counsels' representation.

4.      The Defendant/Petitioner failed to demonstrate that trial counsels' performance was deficient and fell below an objective standard of reasonableness.

5.      The Defendant/Petitioner failed to demonstrate that there is a reasonable probability that, absent any errors allegedly made by trial counsel, a more favorable result would have occurred for the Defendant/Petitioner, specifically, that the jury would have had reasonable doubt respecting the Defendant/Petitioner's guilt.

6.      The Defendant/Petitioner failed to show any prejudice in the proceeding which deprived him of a fair trial.

        IT IS THEREFORE CONSIDERED AND ORDERED that the Defendant/Petitioner's *Amended Rule 37 Petition for Post-Conviction Relief* filed pursuant to Arkansas Rule of Criminal Procedure 37.1 is denied and dismissed.

This appeal followed.

14

III. *Standard of Review*

We do not reverse the denial of postconviction relief unless the circuit court's findings are clearly erroneous. *Conley v. State*, 2014 Ark. 172, 433 S.W.3d 234. A finding is clearly erroneous when, although there is evidence to support it, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made. *Id.* In making a determination on a claim of ineffective assistance of counsel, this court considers the totality of the evidence. *Id.*

Our standard of review also requires that we assess the effectiveness of counsel under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668 (1984). *Conley*, *supra*. In asserting ineffective assistance of counsel under *Strickland*, the petitioner must first demonstrate that counsel's performance was deficient. *Sartin v. State*, 2012 Ark. 155, 400 S.W.3d 694. This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Woods v. State*, 2019 Ark. 62, 567 S.W.3d 494. In other words, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Mancia v. State*, 2015 Ark. 115, 459 S.W.3d 259. Additionally, counsel is allowed great leeway in making strategic and tactical decisions, particularly when deciding not to call a witness. *Johnson v. State*, 2018 Ark. 6, 534 S.W.3d 143. Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel. *Id.* A court must indulge in a strong presumption that

15

counsel's conduct falls within the wide range of reasonable professional assistance. *Woods*, *supra*. The burden is on the petitioner to overcome this presumption and to identify specific acts and omissions by counsel that could not have been the result of reasoned professional judgment. *Sims v. State*, 2015 Ark. 363, 472 S.W.3d 107. Conclusory statements that counsel was ineffective cannot be the basis for postconviction relief. *Id.*

Second, the petitioner must show that the deficient performance prejudiced the defense, which requires a demonstration that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Conley, supra.* This requires the petitioner to show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's errors. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.*

Unless a petitioner makes both *Strickland* showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id.* We also recognize that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Anderson v. State*, 2011 Ark. 488, at 3–4, 385 S.W.3d 783, 787 (quoting *Strickland*, 466 U.S. at 697).

IV. *Holland's Points on Appeal*

A. Trial Counsel Was Ineffective for Selecting an
Unreasonable Strategy of Defense

Holland first argues on appeal that the circuit court erred in denying his petition because his trial counsel was ineffective in selecting an unreasonable defense strategy. Holland contends that, as this court expressed in *Holland I*, trial counsel either knew or should have known that AG would claim penetration in her testimony. Holland argues that his entire defense, including jury voir dire, opening statement, examination of witnesses, and closing argument were negatively affected by trial counsel's strategy that was formulated around the unreasonable belief that AG would not claim penetration.

At the postconviction-relief hearing, Holland's trial counsel Mark Hampton gave the following testimony regarding their trial strategy. Hampton testified that from the discovery provided by the State, AG had alleged only that there was an attempt by Holland to penetrate her vaginal area but that it had been blocked. Hampton stated that because AG's allegations as stated in the reports did not meet the definition of rape under Arkansas law, they decided on a strategy that no penetration had occurred. Hampton assumed that AG would not disclose actual penetration at trial, and when she made these allegations in her testimony, he was "completely shocked." Hampton objected to AG's testimony about penetration on the basis of surprise but lost that argument both at the trial and on direct appeal. Hampton stated that, in retrospect, had they known there was going to be an allegation of forced penetration, that would have "changed everything about the case." Hampton stated it would

17

have changed his jury voir dire, opening statement, and cross-examination of AG and the other State's witnesses. Hampton stated that their defense would have been different and that they "may have run a consent defense as opposed to a lack-of-penetration defense." Hampton stated that before trial, he never contacted AG directly to ask her if she was going to claim penetration, which he said was a "huge error on [his] part." Hampton also stated that he never *specifically* asked the prosecutor whether AG would claim penetration in her testimony, although he said, "[W]e got right up to the line, I will say that." Hampton stated, "[F]rankly . . . I really didn't want . . . to show our hand because we frankly thought the prosecution maybe misunderstood the definition of forcible penetration." Hampton stated that one of the reasons he did not directly ask the prosecutor about penetration was so as to not "tip [their] hand" and reveal their trial strategy. Hampton also testified that, from his understanding of the evidence, this was a reasonable trial strategy.

Hampton's co-counsel, Shane Wilkinson, also testified. Wilkinson stated that he never attempted to speak with AG about her testimony but stated, "Quite frankly, I don't think she would have talked to me." He further acknowledged, "[I]f I could go back and do it again I would have called her and let her not talk to me, and so I could have said she didn't take my call." As far as the defense's strategy, Wilkinson stated, "[A]ny time you have a rape case and penetration is an element of the case and you have not been given evidence of penetration, that's a pretty low-hanging fruit thing . . . you're going to harp on." Wilkinson testified that, despite AG's trial testimony that there was penetration, they put on other defenses during the trial. Wilkinson stated that AG's credibility was a "big issue" in the

18

defense and that Hampton cross-examined AG about "the whole night and everything that went along with it."

Holland now claims that his counsel's trial strategy resulted in ineffective assistance of counsel. Holland states that his counsel's belief that AG would not claim penetration was unjustified and that their defense strategy was based on this invalid premise. Holland asserts that our court in *Holland I* noted that Holland was aware of AG's allegations of penetration before trial. Holland states that before trial, his counsel should have either asked the State directly whether AG would allege penetration or interviewed AG and asked her what her testimony would be. Holland notes that during opening statement, his counsel acknowledged that AG said no when Holland attempted to engage in penetration but then counsel erroneously stated that there would be no evidence that penetration had occurred. Holland argues that because his counsel was aware or should have been aware that AG would allege penetration, counsel instead should have presented the defense that either AG was lying or that the intercourse was consensual. Holland further states that under the *Strickland* analysis, even deliberate trial tactics may constitute ineffective assistance if they fall outside the wide range of professionally competent assistance, and he posits that his counsel's deficient trial strategy resulted in prejudice because it changed everything about the defense of the rape charge.

As an initial matter, we note that our holding on direct appeal in *Holland I* does not resolve the claim of ineffective assistance being raised here as Holland appears to argue. The issue in *Holland I* was whether AG's testimony about penetration was erroneously admitted.

We held, *inter alia*, that because Holland was on notice that penetration was being charged and alleged in the charging document and in his custodial interview, there was no due-process or discovery violation. The issue in *Holland I* was not whether Holland received ineffective assistance of counsel, and in that appeal, we were not asked to decide—nor did we discuss—whether Holland's trial counsel was constitutionally deficient.

The testimony of Holland's counsel at the postconviction-relief hearing showed that because the reports containing AG's statements did not allege penetration, counsel decided to pursue a trial strategy assuming her statements at trial would be consistent with those made in the reports. However, contrary to Holland's argument, after AG disclosed penetration in her testimony, Holland's counsel cross-examined AG and defended against her allegations on the grounds that AG was lying about the penetration and also that any act of penetration was consensual. In the order denying postconviction relief, the circuit court accurately found:

> While the trial counsel team testified in this evidentiary hearing that they were shocked by the victim's testimony of penetration, they were nonetheless prepared for and conducted a spirited cross examination of the victim, including attacking her credibility regarding the penetration allegation. Additionally, they vigorously cross examined all of the state's witnesses regarding any and all physical evidence, documentary evidence, and prior statements.

In Holland's counsel's opening statement at the jury trial, counsel stated that on the night in question, Holland and AG engaged in consensual oral sex but did not engage in intercourse because when Holland attempted to penetrate her vagina, AG told him no and he stopped. In addition to stating there was no intercourse, Holland's counsel also stated in

20

his opening statement that there was no force employed by Holland. After AG testified to penetration during the trial, Holland's counsel thoroughly cross-examined AG with her prior statements that had indicated only an *attempted penetration* to try to impeach her claim that penetration had occurred. Moreover, during Holland's counsel's cross-examination of AG, counsel confronted her with her acknowledgement that consensual acts had taken place, including consensual oral sex performed by both Holland and AG. Therefore, during Holland's counsel's cross-examination of AG, he was clearly attempting to present his defenses that (1) AG was being untruthful about the penetration, and (2) even if penetration did occur, it was consensual.

Holland's counsel also conducted a thorough cross-examination of the State's other witnesses in an attempt to discredit AG's allegation of vaginal penetration. In counsel's cross-examination of both Officer Collins and Nurse Stockton, counsel elicited testimony from both witnesses that they are careful to document everything in their reports and that in neither of their reports was vaginal penetration of AG documented; rather, only an attempt at penetration had been reported. In Holland's counsel's cross-examination of Pugh and Hardy, the serologist and the DNA expert, these witnesses acknowledged that their scientific testing could not confirm that AG had been penetrated by Holland. And finally, in Holland's directed-verdict motions and in his closing argument to the jury, he challenged the evidence of both penetration *and* forcible compulsion and made arguments in support of each of these defenses.

We conclude on this record that Holland failed to establish that his trial counsel's defense strategy was constitutionally deficient or that it changed the outcome of the trial. Regardless of his counsel's assumption that AG would not testify to penetration, the trial and Holland's defense proceeded in much the same way it would have had counsel assumed she would claim penetration. Holland's counsel fully cross-examined AG and the State's other witnesses concerning her failure to claim penetration in the reports generated before trial, and counsel raised a defense against both the allegation of penetration and the allegation of forcible compulsion.

Matters of trial strategy and tactics, even if arguably improvident, fall within the realm of counsel's professional judgment and are not grounds for finding ineffective assistance of counsel. *Johnson v. State*, 2018 Ark. 6, 534 S.W.3d 143. Moreover, even if counsel's conduct is shown to be professionally unreasonable, the judgment will stand unless the petitioner can demonstrate that counsel's error had an actual prejudicial effect on the outcome of the proceeding. *Henington v. State*, 2012 Ark. 81, 403 S.W.3d 55. We find no clear error in the circuit court's finding that Holland's counsel's trial strategy was within the constitutional guarantees of the Sixth Amendment, nor do we find any clear error in the circuit court's finding that there was no demonstration of a reasonable probability of a different outcome but for the "no penetration" trial strategy. Therefore, we hold that Holland is entitled to no relief under this point.

B. Trial Counsel Was Ineffective for Failing to
Move to Exclude the Voicemails

22

Holland next argues that his counsel was ineffective for failing to move to exclude voicemails that he had sent to AG earlier in the evening on the night of the alleged rape. The testimony showed that AG was having dinner with friends and was running late for their scheduled date, during which time Holland left three voicemails. In these voicemails, Holland was noticeably frustrated about AG not answering his calls, and he repeatedly used profane language. For example, in one voicemail, Holland stated, "What I'm doing is trying to get a f***ing hold of you," and "What you're doing is bullsh***ng around." At the end of the last voicemail, Holland stated, "You missed out," and "You've got five minutes to call me back." AG then promptly called him back and they arranged to meet at her house. These voicemails were introduced into evidence with no objection from Holland's counsel. The testimony at trial showed that AG had never listened to these voicemails before she gave her phone to the police for inspection.

At the postconviction-relief hearing, Hampton testified that these voicemails were horrible and had an egregious impact on how Holland was portrayed to the jury. Hampton stated that, in retrospect, they should have at least filed a motion in limine to prohibit admission of the voicemails because of their prejudicial nature, although he also stated he did not know how the circuit court would have ruled. Wilkinson testified:

> I think those voicemails were a statement by a party opponent. . . . I just didn't see any real idea [that] those were ever going to be excluded. And I know there's different strategies by different lawyers. Me, particularly, I try to file motions that I think I should win or have a great chance of winning. That way, it kind of upholds credibility going forward.

Holland contends that his counsel's failure to challenge the admission of the voicemails amounted to ineffective assistance of counsel. Holland asserts that counsel should have moved to exclude the voicemails as irrelevant, substantially more prejudicial than probative, and improper character evidence under Arkansas Rules of Evidence 401, 402, 403, and 404. Holland contends that the voicemails were extremely prejudicial and, in such a close case, were likely the deciding factor in the jury's decision to find Holland guilty.

We disagree with Holland's argument. Holland's counsel made the decision not to challenge the admission of the voicemails, and it is unknown how the circuit court would have ruled had an objection been made. However, as found by the circuit court, it is mere speculation that the introduction of these voicemails was the deciding factor in this case. The voicemails showed that Holland was agitated with AG and cursed at her for being late and not answering her phone. However, as Holland acknowledges in his brief, these voicemails had no bearing on the issues of whether there had been penetration later that night and, if so, whether it was consensual. Moreover, the voicemails were substantially cumulative to the statements of AG and AG's roommate as to Holland's volatile behavior that he later displayed at the house that night. AG stated that on that night, Holland was extremely angry, yelled very loudly at her, belittled her, and threatened to do property damage. This was corroborated by AG's roommate, who testified that sometime after midnight, she heard Holland yelling for five minutes, which caused her concern. Therefore, there was evidence of Holland's undesirable demeanor independent of the voicemails. We conclude that Holland failed to demonstrate how the exclusion of these voicemails would

24

have had a reasonable probability of changing the outcome of the trial; accordingly, we cannot say that the circuit court's denial of postconviction relief on this point was clearly erroneous.

### C. Trial Counsel Was Ineffective for Failing to Prepare or Call Witnesses for Sentencing

Holland's remaining argument is that his counsel was ineffective for failing to prepare or call witnesses during sentencing, and in particular, Holland claims that his mother should have been called as a witness. Holland's mother was present during the entire jury trial, and at the postconviction-relief hearing, she testified that, had she been called as a witness during sentencing, she would have testified that there are many good sides to Holland; that he is close with his family; and that he is very civic minded and is heavily involved in charitable fundraising. Holland cites *State v. Franklin*, 351 Ark. 131, 89 S.W.3d 865 (2002), and states that counsel's inadequate representation during the penalty phase constitutes ineffective assistance of counsel and requires reversal.

At the postconviction-relief hearing, Wilkinson explained counsel's decision not to call Holland's mother as a witness during sentencing:

> I know when Mr. Holland was convicted that his mom was very upset. If I remember correctly, his dad thought she should be the one to testify if anybody did, and I don't know that she could have done it at the time. She was in shock. I mean, I will never forget—quite frankly, I will never forget her reaction to her son being convicted in this case. I will never forget it. It was as if her son had just died in front of her. And I don't know that—I think we just made a judgment call that she would not be in a good spot to testify at that point.

25

In her testimony at the hearing, Holland's mother agreed that she was "totally unprepared" for the verdict:

> When we heard that guilty I squeezed his girlfriend's hand who was sitting next to me and I just buried my head. I was trying not to scream at the top of my lungs, because it was just—I'd have to say the most horrific thing I'd ever heard. I mean, we had gotten bad news in the past about different things, deaths of parents and family members and close friends, but this was by far the worst, and I was just trying to control myself not to scream out loud bloody murder and at the same time breath because I felt like somebody had just totally sucked every bit of life out of me.

In *Franklin*, *supra*, cited by Holland, the supreme court rejected the argument that counsel was ineffective during sentencing for not putting on mitigating evidence and affirmed the denial of postconviction relief. The supreme court wrote:

> While showing that Mr. Franklin had a disrupted and difficult childhood, that he had children to support and that he had received needed counseling at one time are all mitigating factors, they are not unusual instances that would satisfy the *Strickland* criteria that the failure to introduce them constituted an error so serious as to deprive the defendant of a fair trial. There was no showing of mental or emotional impairment or any specific instance of severe trauma that would have caused violent behavior. While these factors are mitigating, the circuit court's order does not state that their absence in the sentencing phase was prejudicial, and we conclude that the absence of this evidence was not so serious as to render the result unreliable.

*Franklin*, 351 Ark. at 142, 89 S.W.3d at 871.

Counsel is allowed great leeway in making strategic and tactical decisions, particularly when deciding not to call a witness. *Crawford v. State*, 2023 Ark. App. 341, 669 S.W.3d 889. In the circuit court's order, it found from the testimony presented at the hearing, that after the guilty verdict was rendered, Holland's mother "was in absolute shock and not capable of testifying" and that Holland's counsel was not ineffective for not calling her as a defense witness. The decision not to call Holland's mother as a witness was a tactical decision, and

under these circumstances, we hold that the circuit court committed no clear error in finding that this decision did not render counsel's representation of Holland ineffective. Moreover, the sentencing range for rape is ten to forty years or a life sentence, and the jury sentenced Holland to thirty-three years. We conclude further that Holland failed to demonstrate prejudice or a reasonable probability that his sentence would have been different had his mother—who was, by her own account, completely overcome with emotion—testified during the sentencing phase.

V. *Conclusion*

For the reasons stated herein, we find no clear error in the circuit court's denial of Holland's Rule 37 petition for postconviction relief. Accordingly, we affirm.

Affirmed.

ABRAMSON and WOOD, JJ., agree.

*Short Law Firm*, by: *Lee D. Short*, for appellant.

*Tim Griffin*, Att'y Gen., by: *David L. Eanes, Jr.*, Ass't Att'y Gen., for appellee.